### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
**Harrisonburg Division**

| | | |
|---|---|---|
| **ANTWHON SUITER,** | ) | |
|     **Plaintiff,** | ) | |
| | ) | **Case No. 5:22-cv-00063** |
| **v.** | ) | |
| | ) | |
| **COUNTY OF AUGUSTA et al.,** | ) | |
|     **Defendants.** | ) | |
| | ) | **By:    Michael F. Urbanski** |
| | ) | **Chief United States District Judge** |

### MEMORANDUM OPINION

In December 2022, Plaintiff Antwhon Suiter, appearing pro se, filed a three-count amended complaint seeking damages and equitable relief against Defendants Augusta County, Sheriff Donald Smith, Deputy M. Obenschain, and Deputy E. Metlenko.[1] See Am. Compl. ¶¶

---

[1] At the time, Suiter was also named plaintiff in a counseled civil case presenting essentially the same § 1983 claims arising out of the same events that Suiter describes in his pro se amended complaint. See generally Compl. ¶¶ 12, 22, 64, 39–49 (Count One), 50–83 (Count Two), 84–90 (Count Three), BLM of Shenandoah Valley, LLC v. Augusta County, No. 5:21cv60 (W.D. Va. Sept. 8, 2021). In BLM, Suiter and nine other plaintiffs sought declaratory and injunctive relief against Augusta County and Sheriff Donald Smith for enforcing the county's noise ordinance. See id. ¶¶ 15, 17, 49, 83, 90. In March 2023, the Honorable Elizabeth K. Dillon dismissed plaintiffs' claims against Augusta County with prejudice, and dismissed their § 1983 claims against Smith without prejudice and with leave to amend. Order 2, BLM of Shenandoah Valley, No. 5:21cv60 (W.D. Va. Mar. 14, 2023); see also Am. Compl., BLM of Shenandoah Valley, No. 5:21cv60 (W.D. Va. Apr. 4, 2023); Oral Order, BLM of Shenandoah Valley, No. 5:21cv60 (W.D. Va. Apr. 14, 2023) (directing plaintiffs to file a motion for leave to amend or correct their first amended complaint); Oral Order, BLM of Shenandoah Valley, No. 5:21cv60 (W.D. Va. May 8, 2023) (granting plaintiffs' motion for leave to file their second amended complaint). That May, six of the original BLM plaintiffs, including Suiter, filed a second amended complaint seeking injunctive relief against Sheriff Smith in his official capacity, and adding new claims for damages against Smith in his individual capacity. See generally Second Am. Compl. ¶¶ 9, 11, 16, 64–65 (Count One), 88–89 (Count Two), 97 (Count Three), BLM of Shenandoah Valley, No. 5:21cv60 (W.D. Va. May 8, 2023). Sheriff Smith promptly moved to dismiss the second amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See Def. Smith's Mot. to Dismiss, BLM of Shenandoah Valley, No. 5:21cv60 (W.D. Va. May 22, 2023). On June 5, and without opposing Smith's Rule 12(b)(6) motion, see W.D. Va. Civ. R. 11(c)(1), plaintiffs filed a notice of voluntary dismissal under Rule 41(a)(1)(A)(i). Notice 1, BLM of Shenandoah Valley, No.

20–25, 33, 67, 79, 87, 89, ECF No. 16-1. The matter is before the court on Defendants' motion to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, ECF No. 18. The motion has been fully briefed, ECF Nos. 19, 21, 23[2], and can be resolved without a hearing.

## I. Standard of Review

A Rule 12(b)(6) motion to dismiss challenges whether a complaint sets out a "short and plain statement of the claim showing that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). To get past the pleading stage, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. at 678 (quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. This "plausibility standard is not akin to a probability requirement," but it does demand "more than a sheer possibility that a defendant has acted unlawfully." Id. (quotation marks omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (quotation marks omitted).

A court resolving a Rule 12(b)(6) motion "must consider the complaint in its entirety," Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007), "accepting as true all well-pleaded allegations . . . and drawing all reasonable factual inferences in the plaintiff's favor,"

---

5:21cv60 (W.D. Va. June 5, 2023). The Notice expressly states that the dismissal is "without prejudice." Id.; see Fed. R. Civ. P. 41(a)(1)(A)–(B).

[2] Suiter also filed an unauthorized sur-reply, ECF No. 24. See W.D. Va. Civ. R. 11(c)(1).

Belmora LLC v. Bayer Consumer Care AG, 819 F.3d 697, 705 (4th Cir. 2016). Legal conclusions or labels, "formulaic recitation[s] of the elements of a cause of action," and "naked assertions devoid of further factual enhancement," Iqbal, 556 U.S. at 678, "are not entitled to the assumption of truth," but they "can provide the framework of a complaint," id. at 679. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief" under the governing law.[3] Id. at 679; see, e.g., Iodice v. United States, 289 F.3d 270, 281 (4th Cir. 2002) ("Dismissal of a complaint for failure to state facts supporting each of the elements of a claim is, of course, proper.").

## II. Background[4] & Procedural History

### A.

---

[3] Because Suiter is a lay person representing himself, he enjoys "the benefit of a liberally construed complaint," Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985), that "must be held to less stringent standards than formal pleadings drafted by lawyers," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). Of course, he is not excused from adhering to basic procedural rules and pleading standards. Beaudett, 775 F.2d at 1278. Suiter "requires no special legal training to recount the facts surrounding his alleged injury, and he must provide such facts if the court is to determine whether" his pleading "makes out a claim on which relief can be granted" against each Defendant on each challenged count. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991); see Bryant v. Wash. Mut. Bank, 524 F. Supp. 2d 753, 756 (W.D. Va. 2007). Additionally, the court recognizes that Suiter "can plead himself out of court by pleading facts that show that he has no legal claim" under the governing law. Schreiber v. Dunabin, 938 F. Supp. 2d 587, 594–95 (E.D. Va. 2013) (quotation marks omitted).

[4] The facts set out below come from Suiter's operative Amended Complaint and copies of written instruments that are exhibits to this pleading, ECF No. 16-1, at 12–22 (Dec. 12, 2022), as well as the publicly available state-court dockets in Commonwealth of Virginia v. Anthwon Suiter, Nos. GC21-7029, GC21-7803 (Augusta Cnty. Gen. Dist. Ct. Sept. 2, 2022) (final dispositions: not guilty). All well-pleaded factual allegations and reasonable inferences drawn therefrom are presented as true and in the light most favorable to Suiter as the nonmoving party.

Plaintiff Antwhon Suiter is the President of Black Lives Matter Shenandoah Valley ("BLMSV") based in Augusta County, Virginia. Am. Compl. ¶ 14. After George Floyd was killed by police officers in May 2020, Suiter trained BLMSV's efforts on "organizing peaceful protests in the Augusta County community." Id. He wanted the protests to "raise awareness of social injustices, inequities in the criminal justice system, and advocate for an end to violence, specifically against Black Americans and communities of color." Id. In late April 2021, Suiter "organized a series of peaceful Black Lives Matter ('BLM') demonstrations . . . to protest police violence." Id. ¶ 34. Most BLM gatherings happened outside the Augusta County Sheriff's Department ("ACSD") in Verona, Virginia. Id.; see also id. ¶ 36. These particular "demonstrations sparked right after the Augusta County Sheriff Deputy [i]nvolved shooting[s] of Dante Harris and Jeffrey Bruce." Id. ¶ 35. Deeply troubled by those shootings and ongoing racial inequities, Suiter "led protests . . . for months to advocate" for ACSD deputies to wear body cameras and use in-car camera systems as a way to promote "transparency[] and accountability." Id. ¶ 16.

BLM events featured "speakers and participants who addressed community members and deputies [o]utside of the Sheriff's Department." Id. ¶ 35. About a month in to BLMSV's ongoing demonstrations, "'Blue Lives Matter' or counter demonstrators" started to gather "on the grassy public area in front of the parking lot" for the ACSD building "[u]sing [m]egaphones and Bluetooth speakers." Id. ¶¶ 36–37. The counter-protestors' use of megaphones and mobile speakers to broadcast their support for law enforcement "[i]nterfered with" the BLM demonstrators' ability to hear their own event's organizers. Id. ¶ 37. ACSD deputies were on the scene, but they "did not [initially] instruct the counter-demonstrators to stop using

bullhorns[] and megaphones during the BLM demonstration[.]" Id. ("Officers . . . did not instruct the counter-protestors to stop . . . until a few days before the ACSD began arresting and charging BLM [p]rotestors."). "While the BLM demonstrations usually ended around 6:00 pm, some BLM demonstrators began protesting more and louder in support of their own messages protesting police violence." Id. ¶ 38. Suiter started "chanting, 'Take that Badge off' and 'F*** the Police.'" Id. (omission in original). "[M]ultiple" other BLM protestors joined in the chants, too. Id. ¶ 39 (alleging that "multiple people" chanted at the same time).

Defendant Donald Smith was the elected Sheriff of Augusta County at this time. Id. ¶ 22. At some point, "Smith and the ACSD issued a preemptory announcement threatening to use Augusta County's Noise Ordinance statute, [§] 15-7A, to justify arrests and . . . disperse crowds gathered to protest police violence[.]" Id. ¶ 10. The noise ordinance reads in relevant part:

### § 15-7. Maximum sound levels in County.

*(a) Sound producing and sound-reproducing devices.* The use[,] operation or playing of any radio, phonograph, television, record, compact disc, tape, digital music, MP3 or DVD player, musical instrument, loudspeaker, sound amplifier or other machine or device capable of producing or reproducing sound, regardless of where such sound-producing or sound-reproducing machine or device is located, whether indoor or outdoor, in such a manner or with such volume that it exceeds 65dBA at the property line, from which the sound emanates, shall be a violation of this article.

*(b)* In all other cases, no person shall permit, operate or cause any source of sound to exceed a sound level of 65dBA, when measured at or outside the property boundary, from which the sound emanates, during the hours between 11:00 p.m. and 6:00 a.m. * * * *

### § 15-8. Exemptions.

Unless otherwise prohibited elsewhere in this article, the following activities or sources of noise shall be exempt from the prohibitions set forth in § 15-7 of this article:

(1) Business, manufacturing, construction or agricultural operations.

5

(2) Activities for which the regulation of noise has been preempted by federal law.

Am. Compl. ¶ 57 ("Exhibit F") (copy of Augusta County, Va., Code §§ 15-7, 15-8 (2020)).[5] "Following this threat," and "after months [of] peaceful gatherings" outside its building, ACSD declared "a riot" in June or July 2021. Id. ¶ 11. "Unprovoked, an overwhelming number of ACSD [d]eputies began ticketing, arresting, and jailing community members. Remaining demonstrators were forced to leave the area temporarily" for fear that they, too, would be arrested and jailed for "exercising their rights to free speech and assembly." Id.

Between June and August 2021, Suiter often joined other BLM protestors in "chanting and singing" outside the ACSD building. Id. ¶ 40. When Smith arrived outside ACSD's offices, he "observed" Suiter and other BLM demonstrators "using megaphones while protesting and chanting." See id. ¶¶ 40–41, 48. From Suiter's perspective, the sheriff "appeared highly agitated over the course of events[.]" Id. ¶ 42. On two occasions, Smith "[i]nstructed" ACSD deputies Defendant M.R. Obenschain and Defendant E. Metlenko to "[a]rrest" Suiter and charge him with violating the noise ordinance for "chanting and signing" with a megaphone. Id. ¶ 40. Suiter alleges that the deputies seized him and his personal belongings without a "warrant or probable cause to do so." Id. ¶ 31.

On June 28, 2021, Obenschain, acting under Smith's direction, approached Suiter "and stated, 'You need to come with us[.]'" Id. ¶ 43. Obenschain and "other deputies escorted"

---

[5] "The noise control program established by this article shall be enforced and administered by the sheriff's department with the assistance of other county departments as required." Augusta County, Va., Code § 15-4. "Any person who violates any provision of this article shall be deemed to be guilty of a class III misdemeanor. The person operating or controlling a noise source shall be guilty of any violation caused by that source." Id. § 15-11(A)–(B).

Suiter into the ACSD and released him on a misdemeanor summons for violating § 15-7(A). Id.; see id. ¶ 52 ("Exhibit A") (copy of Va. Uniform Summons) (June 28, 2021); Commonwealth v. Suiter, No. GC21-7029 (Augusta Cnty. Gen. Dist. Ct. filed June 29, 2021). The same thing happened at a BLM protest a few weeks later. Am. Compl. ¶ 44. On July 20, Metlenko, again acting under Smith's direction, approached Suiter "and stated, 'You need to come with us[.]'" Id. ¶ 43. Metlenko and "other deputies escorted" Suiter into the ACSD building, id., and released him on a misdemeanor summons for "using [a] megaphone – noise violation 2nd off[ense]," under § 15-7(A), id. ¶ 53 ("Exhibit B") (copy of Va. Uniform Summons) (July 20, 2021). See also Commonwealth v. Suiter, No. GC21-7803 (Augusta Cnty. Gen. Dist. Ct. filed July 21, 2021). Suiter alleges that the deputies searched him and "seized" his personal effects, "including his [m]egaphone and [c]ellphone" on both occasions. Am. Compl. ¶ 45.

In September 2022, Suiter and other BLM protestors who were charged with violating § 15-7(A) the previous summer appeared for a joint bench trial in Augusta County General District Court. See id. ¶¶ 49, 52–55; Suiter, Nos. GC21-7029, CG-7803 (Augusta Cnty. Gen. Dist. Ct.) (docket entry of Sept. 2, 2022). The presiding judge found Suiter not guilty of the § 15-7(A) charges, Am. Compl. ¶¶ 52–53, 55, both of which were based on his "megaphone use in the parking lot," id. ¶ 55. The judge explained from the bench that, having "listened to some" of the audio recordings supporting these charges, he was "going to find [each defendant] not guilty by reason of a violation of the [F]irst [A]mendment" because the "statute is unclear," id. ¶ 54 ("Exhibit C"). See also id. ¶ 55 ("Exhibit D"). Suiter "remains committed to protesting police brutality and racial injustice" nationwide, and he intends "to participate in

peaceful protests against police brutality in Augusta County, Virginia." Id. ¶ 19. He fears that Sheriff Smith will once again "abuse" § 15-7(A) to suppress Suiter's constitutionally protected speech and activities. Id. ¶ 20; see also id. ¶ 48 (citing Augusta County, Va. Code § 15-8(2) ("[T]he following activities or sources of noise shall be exempt from the prohibitions set forth in § 15-7 of this article: . . . Activities for which the regulation of noise has been preempted by federal law.")).

## B.

In December 2022, Suiter filed a three-count amended complaint against Defendants Augusta County, Sheriff Smith, Deputy Obenschain, and Deputy Metlenko, in both their "individual and official" capacities, Am. Compl. 1 (caption), for violating Suiter's rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. § 1983, see id. ¶¶ 20–25. On each count, his amended complaint explicitly seeks damages and retrospective declaratory or injunctive relief to remedy past violations of federal law. See id. ¶¶ 13, 33, 63, 67, 77, 79, 87, 89; Am. Compl. 22, ¶¶ 1–2 (prayer for relief). See generally Republic of Paraguay v. Allen, 134 F.3d 622, 628 (4th Cir. 1998) (explaining that "retrospective relief," whether in the form of damages, an injunction, or declaratory judgment, is always intended to remedy past legal injuries). Liberally construed, it also challenges § 15-7(A) as applied to Suiter's conduct, see, e.g., Am. Compl. ¶¶ 12, 20, 48, 57, 75, and arguably seeks prospective injunctive relief against Sheriff Smith in his official capacity to prevent that subsection's enforcement against Suiter if he uses a megaphone at future demonstrations, see, e.g., id. ¶¶ 12, 20, 63, 77, 87. Cf. BLM of Shenandoah Valley, LLC v. Augusta County, No. 5:21cv60, 2023 WL 2505493, at *6–8 (W.D. Va. Mar. 14, 2023) (Dillon, J.) (construing similar

allegations as an as-applied challenge to § 15-7(A) and request for injunctive relief against Sheriff Smith in his official capacity, but not against Augusta County).

In Count I, Suiter alleges that Defendants Smith, Obenschain, and Metlenko "arrested" him and charged him with violating § 15-7(A) to "retaliate" against Suiter for exercising his First Amendment rights to free speech and peaceful protest. Am. Compl. ¶¶ 58–67 ("First Amendment-Petition/Protest"). Count I also asserts a cause of action against all Defendants under the Virginia Constitution's free speech clause, see id. ¶¶ 2, 20, 58–67 (citing Va. Const. art. I, § 12), which "is coextensive with the free speech provisions of the Federal First Amendment," Elliot v. Commonwealth, 593 S.E.2d 263, 269 (Va. 2004). In Count II, Suiter alleges that Defendants Smith, Obenschain, and Metlenko "seized" Suiter and his personal belongings without a warrant or probable cause. See Am. Compl. ¶¶ 68–79 ("Fourth Amendment-Unlawful Seizure and Excessive Force").[6] In Count III, Suiter asserts a free-standing Fourteenth Amendment "deprivation of rights" claim based on the First Amendment retaliation claim in Count I and the Fourth Amendment seizure claim in Count II. See id. ¶¶ 80–89. Suiter named Augusta County as a defendant to all three counts because the county allegedly "governs" and "funds" the ACSD, which allowed Smith to carry out his "unconstitutional and dangerous policies and practices" in the summer of 2021. See id. ¶ 21. "[T]here is no facial challenge to the County's noise ordinance," BLM of Shenandoah Valley,

---

[6] Suiter also alleges that the deputies "searched" his person incident to this "arrest," but he does not plead any facts supporting an inference that deputies actually touched him during either encounter. See Riley v. California, 573 U.S. 373, 382–86 (2012) (noting that a "pat down" constitutes a "search" and describing the circumstances under which the Fourth Amendment permits warrantless searches incident to arrest). Accordingly, the court does not interpret Count II as raising a separate Fourth Amendment search claim.

2023 WL 2505493, at *6. <u>See generally</u> Am. Compl. ¶¶ 5, 10, 20–21, 31, 40, 43–44, 48 (challenging § 15-7(A) as applied to Suiter's conduct).

Defendants moved to dismiss the Amended Complaint under Rule 12(b)(6). <u>See</u> Defs.' Mot. to Dismiss, ECF No. 18; Defs.' Br. in Supp. 1–2, ECF No. 19. Augusta County argues that it should be dismissed from the suit because it has no legal authority to control Sheriff Smith or his deputies and Suiter does not allege that the county itself was involved in the underlying events. <u>See</u> Defs.' Br. in Supp. 5–7 (citing Va. Code § 15.2-1600). Defendants Smith, Obenschain, and Metlenko assert that Suiter has sued them "<u>solely</u> in their official capacities" and, as such, the "Eleventh Amendment bars all claims for money damages" against them. <u>Id.</u> at 7 (emphasis added); <u>see also</u> Defs.' Reply 5, ECF No. 23. <u>But see</u> Am. Compl. 1 (naming each defendant "in his individual and official capacity").

Smith, Obenschain, and Metlenko argue that Count I does not state a plausible First Amendment retaliation claim because Suiter "failed to plead sufficient facts to demonstrate the absence of probable cause" to believe he was violating the noise ordinance when he was detained. <u>See</u> Defs.' Br. in Supp. 8–9. They also argue there is no private right of action to enforce Article I, section 12 of the Virginia Constitution because that provision is not "self-executing." <u>See</u> <u>id.</u> at 10–11. On Count II, Smith, Obenschain, and Metlenko argue that Suiter was not "seized" when the deputies issued "a summons for a noise violation" and, even if he was, he "failed to plead sufficient facts to demonstrate the absence of probable cause." <u>See</u> <u>id.</u> at 12–15. Finally, they argue that Count III should be dismissed because its free-standing Fourteenth Amendment "claim collapses into the First and Fourth Amendment claims" in

Counts I and II, respectively. See id. at 20 (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). Suiter responded to each argument. See Pl.'s Br. in Opp'n 8–23, ECF No. 22.

### III. Discussion

A § 1983 claim has two basic elements: "[A] plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). The facts needed to plausibly establish each element depend on the specific constitutional provision or right at issue, Iqbal, 556 U.S. at 677; Daniels v. Williams, 474 U.S. 327, 330 (1986); Loftus v. Bobzien, 848 F.3d 278, 285 (4th Cir. 2017); the capacity in which the plaintiff sued the defendant, Kentucky v. Graham, 473 U.S. 159, 165–68 (1985); and, relatedly, the nature of relief sought against that defendant, Biggs v. Meadows, 66 F.3d 56, 60–61 (4th Cir. 1995). The court considers Defendants' arguments against the § 1983 claims under this framework.

### A.

Suiter alleges that Augusta County violated his First and Fourth Amendment rights solely because the county "governs" and "funds" the ACSD, which allowed Smith to carry out his "unconstitutional and dangerous policies and practices" in the summer of 2021. See Am. Compl. ¶ 21. He does not allege that § 15-7(A) itself—which is plainly content neutral—violates the First Amendment, see generally id. ¶¶ 5, 10, 20–21, 31, 40, 43–44, 48. See BLM of Shenandoah Valley, 2023 WL 2505493, at *6, *8 (concluding that similar allegations did not present a "facial challenge" to § 15-7(A), explaining that the First Amendment generally forbids content-based regulations, and finding the ordinance is content neutral).

Local governments, including Virginia counties, are "persons" amenable to suit under § 1983. See Miller v. Parrish, No. 3:12cv873, 2013 WL 791241, at *3 (E.D. Va. Mar. 4, 2013) (citing Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 690–91 (1978)). Because § 1983 does not permit vicarious liability, "[h]owever, a local government can only be held liable under § 1983 'through an official policy or custom.'" Id. at *4 (quoting Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (other quotation marks omitted)). Such a policy or custom can arise through: (1) an express policy, like a "written ordinance or regulation"; (2) "the decisions of a person with final policymaking authority" for the local government; (3) an act or omission "that manifests deliberate indifference to the rights of citizens"; or (4) "a practice that is so persistent and widespread" that it constitutes "a custom or usage with the force of law." Lytle, 326 F.3d at 471 (cleaned up). The policy or custom must be attributable to the local government itself. See Monell, 436 U.S. at 691.

In Virginia, a county cannot be held liable for the policies or practices of independent "constitutional officers," such as the local elected sheriff, because those officers "do not depend upon . . . the governing bodies of their counties or cities for their authority." Miller, 2013 WL 791241, at *4 (quoting Doud v. Commonwealth, 717 S.E.2d 124, 126 (Va. 2011)); see Va. Code § 15.2-1600. "In other words, the [Augusta County] Sheriff and his Office 'are distinct from' the County." BLM of Shenandoah Valley, 2023 WL 2505493, at *6 (quoting Miller, 2013 WL 791241, at *4). The fact that a "county or city may appropriate funds for the operation of the sheriff's office," Va. Code § 15.2-1613, as Suiter alleges Augusta County does here, "in no way alters this conclusion," Strickler v. Waters, 989 F.2d 1375, 1390 (4th Cir. 1993) (holding that Virginia law that imposed on cities the costs of keeping local jails "in good

order" did not expose city to liability under <u>Monell</u>). "Therefore, Augusta County is not responsible for actions taken by the Sheriff or his agents" at the protests. <u>BLM of Shenandoah Valley</u>, 2023 WL 2505493, at *6. The court will grant the Rule 12(b)(6) motion to dismiss the County from this action with prejudice. <u>Id.</u>

### B.

### 1.

Defendants Smith, Obenschain, and Metlenko correctly note that the Eleventh Amendment bars Suiter's claims for damages against them in their "official" capacities. <u>Graham</u>, 473 U.S. at 169; <u>Biggs</u>, 66 F.3d at 61. The Eleventh Amendment also bars Suiter's requests for retrospective declaratory or injunctive relief holding that these state officials "violated" his federal constitutional rights, Am. Compl. ¶¶ 13, 63, 77, in the summer of 2021. <u>See</u> <u>Allen</u>, 134 F.3d at 627 (citing <u>Edelman v. Jordan</u>, 415 U.S. 651, 666–67 (1974)). Accordingly, those official-capacity claims will be dismissed on immunity grounds.

The Eleventh Amendment does not bar Suiter's as-applied challenge to § 15-7(A), under federal First Amendment principles, which arguably seeks prospective injunctive relief against Smith in his official capacity to prevent Smith from detaining or charging Suiter the next time he uses a megaphone at an otherwise peaceful protest, <u>see</u> Am. Compl. ¶¶ 20, 31, 41, 45, 48, 65. <u>BLM of Shenandoah Valley</u>, 2023 WL 2505493, at *7–8. Additionally, although the Virginia Supreme Court "has not settled the scope of an implied right of action under Article I, § 12," some lower state courts have recognized a private right of action where, as here, the plaintiff challenges the constitutionality of a state law or local ordinance. <u>Mais v. Albemarle Cnty. Sch. Bd.</u>, No. 3:22cv51, 2023 WL 2143471, at *6 (W.D. Va. Feb. 21, 2023)

(published decision) (citing cases). Article I, § 12 "is coextensive with the free speech provisions of the Federal First Amendment." Elliot, 593 S.E.2d at 269. Thus, the same standard applies to Suiter's as-applied challenge under either provision. See Key v. Robertson, 626 F. Supp. 2d 566, 583 (E.D. Va. 2009) (citing Elliot, 593 S.E.2d at 269).

Section 15-7(A) is a content-neutral "time, place, and manner" regulation of First Amendment protected speech and activities. BLM of Shenandoah Valley, 2023 WL 2505493, at *8. Such regulations are subject to "intermediate scrutiny" rather than the more demanding strict scrutiny applicable to content-based regulations. See id. (citing City of Cincinnati v. Discovery Network, 507 U.S. 410, 428 1993)). To meet that standard, § 15-7(A) therefore "must be 'narrowly tailored to serve a significant governmental interest'" and "must 'leave open ample alternative channels for communication of the information' that [Suiter] wishes to communicate.'" Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). It is "well established that the government has 'a substantial interest in protecting its citizens from unwelcome noise.'" Id. at *8 (quoting Ward, 491 U.S. at 796). "That interest 'remains significant' when it comes to 'protect[ing] even such traditional public forums such as city streets and parks from excessive noise'" emanating from protests on matters of public concern. Id. (quoting Ward, 491 U.S. at 796).

The merits of Defendants' motion to dismiss Count I therefore depends on whether § 15-7(A), "as applied to [Suiter], is narrowly tailored to serve the government interest and leaves ample alternative[] channels of communication." Id. at *9. Ordinarily, those are "highly fact-intensive" questions that ought not be resolved on a Rule 12(b)(6) motion. Id. In this case, however, Suiter's allegations, accepted as true and viewed in his favor, simply do not support

14

a reasonable inference that Sheriff Smith violated Suiter's First Amendment rights by enforcing § 15-7(A) against him for using a megaphone to amplify his speech. See id. at *9–11.

First, § 15-7(A) explicitly leaves open "ample alternative channels" for Suiter to communicate his message against police brutality—it merely "prohibits the use of noise-amplifying machines 'in such a <u>manner</u> or with such volume' that it exceeds 65 decibels at the property line." <u>Id.</u> at *8 (quoting § 15-7(A)). Suiter is still free to sing and chant without using a megaphone, or with a megaphone so long as the volume does not exceed 65 decibels. <u>See</u> <u>id.</u> at *9. Second, Suiter does not allege any facts suggesting § 15-7(A) is not "narrowly tailored" to serve the county's significant interest in protecting its residents from excessively loud machine-amplified noises. <u>See id.</u> (noting that a court resolving a Rule 12(b)(6) motion "cannot read into the complaint allegations that are not squarely presented on the face" of the pleading (quotation marks omitted)). On the contrary, he alleges that he was chanting and singing through a megaphone while standing right outside the ACSD building, <u>see</u> Am. Compl. ¶¶ 11, 34–36, 41, 55, where ACSD staff presumably were trying to work, <u>see</u> <u>id.</u> ¶¶ 40, 42. <u>See</u> <u>McClellan v. City of Alexandria</u>, 363 F. Supp. 3d 665, 666–67 (E.D. Va. 2019) (noting that the "nature of the situs of the protected speech is always relevant for purposes of analyzing narrow tailoring" because the government's interest in regulating noise is relative to the surrounding environment). Sheriff Smith "appeared highly agitated" by the noise, Am. Compl. ¶ 42, which Suiter admits grew progressively "louder," <u>id.</u> ¶ 38, both times ACSD deputies charged Suiter with violating § 15-7(A). Even viewed in Suiter's favor, those facts cannot support a reasonable inference that his machine-amplified speech "was not dangerously, loud, disturbing, annoying,

or disruptive" under the circumstances. <u>BLM of Shenandoah Valley</u>, 2023 WL 2505493, at *9 (quoting <u>McClellan</u>, 363 F. Supp. 3d at 677). Accordingly, Suiter has failed to state a claim that enforcing § 15-7(A) against him violated his First Amendment rights. <u>See id.</u>

**2.**

Suiter also sued Smith, Obenschain, and Metlenko in their individual capacities, Am. Compl. 1 (caption), and sought damages against each defendant for his personal involvement in Suiter's arrests in June and July 2021, <u>id.</u> ¶¶ 67, 79, 89. <u>See</u> <u>Biggs</u>, 66 F.3d at 61 ("Another indication that suit has been brought against a state actor personally may be a plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity suits."). Suiter alleges that Smith violated his First Amendment and Fourth Amendment rights when he directed Obenschain and Metlenko to detain or "arrest" Suiter without a "warrant or probable cause to do so," Am. Compl. ¶ 31. <u>See id.</u> ¶¶ 42, 59–60, 69–70. He alleges that Obenschain and Metlenko violated his First and Fourth Amendment rights by "detain[ing]," or "threatening" to arrest him, also without a warrant or probable cause. <u>See id.</u> ¶¶ 31, 42–43, 59–60, 69–70.

**i.**

"As a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." <u>Nieves v. Bartlett</u>, --- U.S. ---, ---, 139 S. Ct. 1715, 1722 (2019) (cleaned up). To state a First Amendment retaliation claim against each individual Defendant, Suiter's complaint must allege facts supporting a reasonable inference that: (1) Suiter "engaged in protected First Amendment activity"; (2) each Defendant "took some action that adversely affected [Suiter's] First

Amendment rights"; and (3) "there was a causal relationship between [Suiter's] protected activity and [the Defendant's] conduct." Buxton v. Kurtinitis, 862 F.3d 423, 427 (4th Cir. 2017) (quotation marks omitted). The individual "Defendants assume for the purposes of this motion only that the first two elements are met." Defs.' Br. in Supp. 8; accord Hous. Cmty. Coll. Sys. v. Wilson, --- U.S. ---, ---, 142 S. Ct. 1253, 1260 (2022) (noting that an arrest or prosecution easily satisfy the "adverse action" element, but that "less harsh" actions can also qualify); Jim Crockett Promotion, Inc. v. City of Charlotte, 706 F.2d 486, 491 (4th Cir. 1983) ("[T]he right to amplify speech is within the protection of the First Amendment." (quotation marks omitted)). They focus on the third element, but-for causation. See Defs.' Br. in Supp. 8–10.

This element is difficult to satisfy. Porter v. Bd. of Trs. of N.C. State Univ., 72 F.4th 573, 583 (4th Cir. 2023). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury." Nieves, 139 S. Ct. at 1722. "Specifically, it must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." Id. "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." Id. (quotation marks omitted) (emphasis added). A more difficult question arises when non-retaliatory grounds are sufficient to provoke those adverse consequences—such as when a raucous protestor is arrested for alleged disorderly conduct. See generally id. at 1722–24. In those cases, "[t]he plaintiff pressing a retaliatory arrest claim must plead and [ultimately] prove the absence of probable cause for the

17

arrest." Id. at 1724. "Absent such a showing, a retaliatory arrest claim fails. But if the plaintiff establishes the absence of probable cause," then he need only show that "retaliation was a substantial or motivating factor behind the arrest." Id. at 1725 (cleaned up); see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Probable cause means "a reasonable ground for belief of guilt . . . . particularized with respect to the person to be searched or seized." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (cleaned up); accord Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). It is an objective standard based on the suspect's conduct and totality of circumstances known to the arresting officer, Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017), and "the contours of the offense thought to be committed by that conduct," Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016) (quotation marks omitted). Thus, to plead "an absence of probable cause, [Suiter] must allege a set of facts which made it unjustifiable for a reasonable officer to conclude that []he was violating the [county's noise] ordinance." Brown v. Gilmore, 278 F.3d 362, 368 (4th Cir. 2002) (summary judgment); accord Stutzman v. Krenik, 350 F. Supp. 3d 366, 377 (D. Md. 2018) (quoting Brown, 278 F.3d at 368) (Rule 12(b)(6)).

In the summer of 2021, § 15-7(A) made it unlawful to use or operate a "loud speaker, sound amplifier, or other machine or device capable of producing or reproducing sound . . . in such a manner or with such volume that it exceeds 65dBA at the property line[] from which the sound emanates." Augusta County, Va., Code § 15-7(A). It was not unlawful to use a

loudspeaker, sound amplifier, or other device in such a manner that the volume stayed below 65 decibels. See id. § 15-7(A)–(B); BLM of Shenandoah Valley, 2023 WL 2505493, at *9.

Defendants argue Suiter has failed to plead the absence of probable cause because he "acknowledges that he operated a megaphone" while protesting with others "who were growing progressively louder" and he "does not deny that the noise emanating from the megaphone exceeded the 65 decibels" set out in the county code. Defs.' Br. in Supp. 13–14. The court agrees. Accord BLM of Shenandoah Valley, 2023 WL 2505493, at *9, *11 (reaching the same conclusion where complaint affirmatively alleged that two plaintiffs "used megaphones" during a large BLM protest where "the scene and the noise were quite intense," and the complaint did "not allege that the noise therefrom was less than that prohibited by the ordinance"). Suiter alleges that he was using a megaphone while chanting and singing with "multiple people" when he was detained. See Am. Compl. ¶¶ 39–41, 45, 48, 53. He does not allege that he "complied with the 65-decible threshold during the protest, []or that [he] took any noise-related precautions from which the court could presume compliance for purposes of a motion to dismiss." BLM of Shenandoah Valley, 2023 WL 2505493, at *10. On the contrary, he alleges that Smith and his deputies were faced with two groups of opposing protestors using megaphones or bullhorns to amplify their messages. See Am. Compl. ¶ 37. Deputies eventually instructed everyone to "stop using [b]ullhorns[] and [m]egaphones," and the Blue Lives Matter protestors apparently complied. See id. "[S]ome BLM demonstrators," on the other hand, "began protesting more and louder in support of their own message protesting police violence." Id. ¶ 38. Deputies "began arresting and charging BLM

19

"[p]rotestors" with violating the noise ordinance "a few days" later. Id. ¶ 37. Suiter was using a megaphone when he was detained and charged under § 15-7(A). Id. ¶¶ 40–41, 45, 48.

"Based on the description provided in the complaint, an objectively reasonable deputy sheriff could have believed that [Suiter's] amplified speech exceeded the permissible volume." BLM of Shenandoah Valley, 2023 WL 2505493, at *11 (also noting that § 15-11 "creates a rebuttable presumption" that the person operating a noise-amplifying device is guilty of any violation caused by that device). Suiter's assertion that Defendants detained and charged him without "probable cause to do so," Am. Compl. ¶ 31, "rest[s] only on conclusions and not facts," BLM of Shenandoah Valley, 2023 WL 2505493, at *11. Accordingly, Count I will be dismissed. See id. at *13 (dismissing First Amendment retaliation claim where "the complaint [did] not sufficiently allege a lack of probable cause as to the noise ordinance citations"); cf. 626 F. Supp. 2d at 583 (noting any Article I, § 12 free-speech claim would "fail for the same reasons that [the] First Amendment claim fails").

## 2.

The Fourth Amendment protects a person and his "effects[] against unreasonable searches and seizures" by government actors. U.S. Const. amend. IV, cl. 1; see generally Brower v. County of Inyo, 489 U.S. 593, 599 (1989). A person is "seized" when officers use "physical force or a show of authority that in some way restrains the liberty of the person." Torres v. Madrid, --- U.S. ---, ---, 141 S. Ct. 989, 995 (2021) (cleaned up). A "show of authority" constitutes a seizure when "the totality of the circumstances demonstrates that a reasonable person, measured objectively from an innocent citizen's perspective, 'would have believed that he was not free to leave,'" and the person submits to that authority. United States v. Cloud,

20

994 F.3d 233, 242 (4th Cir. 2021) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

The well-pleaded facts in Suiter's complaint show that one deputy approached Suiter in public and told him, "'You need to come with us'" and then at least one deputy "escorted" Suiter into the ACSD building and kept him there just long enough to "ID" him and issue a citation for violating the noise ordinance. Am. Compl. ¶¶ 43–44, 69–70. Suiter asserts several times that the deputies "arrested" him "through the use of force," but he does not plead any facts showing a deputy actually touched him. He also alleges that deputies used the "threat of arrest" to "terminate[]" his "freedom of movement," id. ¶ 69, but he does not describe those alleged threats. Cf. Warner v. Centra Health, Inc., 503 F. Supp. 3d 479, 492 (W.D. Va. 2020) (allegation that two armed guards "escorted" plaintiff "from Point A to Point B," without more, "could not constitute a seizure" for Fourth Amendment purposes where plaintiff did not allege that the guards "brandished weapons, threatened [him] during the escort process, or otherwise indicated [that his] compliance may be compelled").

At most, Suiter's well-pleaded allegations describe encounters akin to an officer conducting "a routine traffic stop" after personally "observing a traffic violation," United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop," such as "request[ing] a driver's license and vehicle registration, run[ning] a computer check, and issu[ing] a citation" for the initial violation (internal quotation marks omitted)). A nonconsensual "traffic stop 'constitutes a seizure, no matter how brief the detention or how limited its purpose,' and 'is thus subject

to the constitutional imperative that it not be unreasonable under the circumstances.'" <u>Glass v. Anne Arundel County</u>, 716 F. App'x 179, 180 (4th Cir. 2018) (per curiam) (quoting <u>Branch</u>, 537 F.3d at 335)). <u>See generally</u> <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996). Such seizures are reasonable when the officer has "probable cause or reasonable suspicion" to believe the driver committed a traffic violation. <u>United States v. Johnson</u>, 734 F.3d 270, 275 (4th Cir. 2013). The more demanding probable cause standard is met when the officer personally observes the violation. <u>Id.</u> (citing <u>Whren</u>, 517 U.S. at 810–13).

As explained above, Suiter's complaint does not sufficiently allege the deputies lacked probable cause to believe that he was violating § 15-7(A) when they detained him. Accordingly, Count II will be dismissed. <u>BLM of Shenandoah Valley</u>, 2023 WL 2505493, at *11 (dismissing a similar Fourth Amendment claim on the same grounds).

### 3.

In Count III, Suiter tries to assert a free-standing Fourteenth Amendment "deprivation of rights" claim based on the First Amendment retaliation claim in Count I and the Fourth Amendment claim in Count II. <u>See</u> Am. Compl. ¶¶ 80–89. The First Amendment and Fourth Amendment each "provide[] an explicit textual source of constitutional protection against th[e] sort" of governmental conduct, <u>Graham</u>, 490 U.S. at 395, complained of in Count III. Accordingly, those "Amendment[s], not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." <u>Id.</u> (Fourth Amendment seizures); <u>see</u> <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 248 n.11 (4th Cir. 1999) (First Amendment retaliation). Count III will be dismissed. <u>See</u> <u>Spry v. West Virginia</u>, No. 2:16cv1785, 2017 WL 440733, at *6, *14 (S.D. W. Va. Feb. 1, 2017).

## IV.

For the foregoing reasons, the court will **GRANT** Defendants' motion to dismiss the

Amended Complaint, ECF No. 18, and dismiss the action in its entirety.

ENTER: September 27, 2023

Michael F. Urbanski
Chief U.S. District Judge
2023.09.27 10:30:16 -04'00'

Michael  F. Urbanski
Chief United States District Judge